IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


GREGORY NATHANIEL HEISHMAN                                    PLAINTIFF

v.                              Civil No. 4:22-cv-04013

JAIL ADMINISTRATOR GINA BUTLER                              DEFENDANTS


## REPORT AND RECOMMENDATION

This is a civil rights action filed *pro* se by Plaintiff, Gregory Nathaniel Heishman, under 42 U.S.C. § 1983.  Plaintiff names as the sole Defendant, Jail Administrator Gina Butler.  Before the Court is a Motion for Summary Judgment filed by Defendant Butler. (ECF No. 17).  Plaintiff filed a Response (ECF No. 22).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I. BACKGROUND

Plaintiff is currently incarcerated in the Arkansas Department of Corrections – North Central Unit ("ADC") in Calico Rock, Arkansas.  His claims in this action arise from his incarceration in the Little River County Jail ("LRCJ") in Ashdown, Arkansas in January 2022.  At all times relevant to the instant lawsuit, Defendant Butler was the Administrator of the LRCJ, and Plaintiff was a convicted ADC inmate being held at the LRCJ awaiting transfer.  (ECF No. 1).

Plaintiff was booked into the LRCJ on June 30, 2021 on charges of possession of controlled substances, drug paraphernalia, driving on a suspended license, and no licenses on vehicle.  (ECF No. 19-2).  Plaintiff was convicted on December 10, 2021, so at all times relevant to the instant

1

case, Plaintiff was a convicted inmate.

### A. Procedural Background

Plaintiff filed his Complaint on February 9, 2022 (ECF No. 1).  Defendant Butler Answered

on March 28, 2022.  (ECF No. 9).  In his Complaint, Plaintiff makes two claims against Defendant

Butler in her official capacity only.  First, Plaintiff claims Defendant Butler denied him proper

medical care on January 19, 2022.  (ECF No. 1, pp. 4-5).  In his Complaint, Plaintiff states Claim

1 as follows:

> After several inmates had gotten sick, I, through the grievance process, requested a
> COVID-19 test and vac[c]ine.  Later, after being denied the request by Gina Butler saying
> we would receive the vac[c]ine once reaching ADC and that the county wasn't going to
> pay to test the inmates in the jail, resulting in me becoming extremely ill that evening.

> *Id*.  (errors in original).

When prompted to explain how this claim is an official capacity claim, Plaintiff stated:

> Failure to test new inmates for [COVID-19] upon arrival per Gina Butlers orders as well
> as the removal of masks inside the jail.  The officers move from inmates, quarantined for
> 7 days max, to inmates without any decontamination process.

> *Id*.

In Plaintiff's Claim 2 he alleges Defendant Butler violated his constitutional rights again

on January 20, 2022 by denying him medical care:

> Around 2:30 am I pressed the intercom button.  I explained I was feeling dizzy and was
> short of breath.  I requested to go to the hospital.  Officer McFadden escorted me to the
> intake room and proceeded to take my vitals.  BP was 138/86 and temp was 92.6° F.  I was
> escorted back to my cell and was told they would be calling the doctor to get the clear to
> take me to the hospital which never happened because they couldn't get ahold of the doctor.

> (ECF No. 1, pp. 6-7) (errors in original).

When prompted to explain how Claim 2 is an official capacity claim, Plaintiff stated:

> Because of the lack of on-site medical staff I was unable to receive approval to be
> transported to the hospital.  The dangerous drop in body temperature could have resulted

2

in serious injury or even death.

*Id.*

For relief, Plaintiff requests compensatory and punitive damages, Defendant Butler's resignation, and LRCJ ordered to hire a full-time nurse.  (ECF No. 1, p. 9).

Defendant Butler filed her Motion for Summary Judgment, Brief in Support, and Statement of Indisputable Facts on October 3, 2022.  (ECF Nos. 17, 18, 19).  In her Motion, Defendant Butler argues (1) Plaintiff has failed to allege facts establishing she was deliberately indifferent to Plaintiff's serious medical need;[1] (2) Defendant Butler did not fail to protect Plaintiff from COVID-19;[2] and (3) there is no basis for Plaintiff's official capacity claims against Defendant Butler.  (ECF No. 18).

**B.  Factual background**

The factual allegations in this matter are largely undisputed.  In support of her Motion, Defendant Butler offered extensive factual support, and Plaintiff provided a well-organized objection to those of Defendant's facts he disputes.  The Court will enumerate all material facts in this section and note any facts disputed by Plaintiff.[3]

On an undated medical request form, Plaintiff requested a COVID-19 test and vaccine.

---

[1]  The Court notes Plaintiff did not assert an individual capacity claim against Defendant Butler, nonetheless, Defendant analyzed the issues as if Plaintiff asserted individual capacity claims as well.  Accordingly, the Court will address such analysis.

[2]  While Plaintiff describes his Claim 1 as a denial of medical care claim, Defendants have appropriately interpreted it as a failure to protect from COVID-19 claim.  Plaintiff did not object to this interpretation so the Court will analyze it as such.

[3]  While the Court appreciates the Parties' thorough rendition of all facts, medical requests, and responses in their briefing, the only facts included here are those material to Plaintiff's Claim 1 and 2 which involve request for medical attention related to COVID-19 or COVID-19 like symptoms on January 19-20, 2022.  All other medical, mental health, or dental requests are not relevant to the analysis of these claims.

(ECF No. 19-4, p. 15).  Plaintiff stated in his Deposition this request was submitted on January 19, 2022.  (ECF No. 24, p. 1).  In the response section of the medical request form, "per admin" was handwritten.  (ECF No. 19-4, p. 15).  According to Defendant Butler, this response note was written because of the policy that COVID-19 testing was only done for detainees showing symptoms, and Plaintiff was not showing any symptoms at the time of this request.  (ECF No. 19-1, p. 2).  Defendant Butler also stated in her Affidavit she was not authorized to direct or order testing or vaccination for COVID-19 for detainees.  (ECF No. 19-1, p. 2).  Plaintiff disputes this fact, as he asserts Dr. Elkins informed Plaintiff he could not test or vaccinate Plaintiff without direction from Defendant Butler.  (ECF No. 24, p. 1)

Plaintiff testified in his deposition he began feeling sick with a sore throat, aches, and other flu like symptoms on the morning of January 19, 2022.  As the day progressed so did Plaintiff's symptoms culminating in a headache, nausea, diarrhea, and dehydration.  (ECF No. 19-7, p. 45).  Plaintiff did not attempt to secure the COVID-19 vaccination prior to his incarceration in June 2021.  (ECF No. 19-7, pp. 23-24).  Plaintiff verbally requested a COVID-19 vaccine for months prior to his January complaints.  *Id*. at 25.  Plaintiff wanted a vaccine because COVID-19 seemed to be bad at that time, people were constantly coming in and out of the LRCJ, the staff only sometimes wore masks, and the inmates were not allowed to wear masks.  *Id*. at 26-27.  Plaintiff did not suffer COVID-19 symptoms prior to January 2022.  *Id.* at 27.  Plaintiff only requested testing on January 19, 2022 because he believed he needed a negative test before he could receive the vaccination.  *Id*.

Defendant produced multiple recordings of body camera footage from officers interacting with Plaintiff at the LRCJ on January 19 – 20, 2023.  (ECF No. 19-5).  On January 19, 2022, Body Camera Footage number 202201192112 shows:

> At around 9:25 pm an officer is passing out laundry to the inmates and checking their temperatures when requested.  None of the inmates' temperatures broke 99 degrees.  Plaintiff had his temperature checked at 16:18 minutes and it was 98.9 degrees.  Plaintiff says that he is dying, and the Officer states that he will let the doctor know.[4]

(ECF No. 19, p. 2).  Plaintiff's only objection to this bodycam footage is his belief the doctor was never actually called.  (ECF No. 24, p. 1).  The Court notes there are no visible signs of physical distress exhibited by Plaintiff in this body camera footage.

On January 19, 2022, Body Camera Footage number 202201192203 shows the following:

> At around 10:08 pm an officer takes Plaintiff some nasal spray and they talk about how someone thought they had covid, but it was actually a sinus infection.

(ECF No. 19, p. 2).  Plaintiff does not object to this footage.

Plaintiff did not submit a written medical request on January 19, 2022.  He testified in his deposition he did not submit a written request because it was unnecessary at that time as the officers were aware of his condition.  Plaintiff stated, he knew the doctor would be coming by the next week and he could see him at that time.  (ECF No. 19-7, pp. 50-51).  Plaintiff also testified he verbally requested to go to the hospital on January 19, 2022, instead of submitting a written request for transport to the emergency room.  *Id.* at 45.  This is why there is no written medical request to be transferred to the emergency room on the record.

On January 20, 2022, Body Camera Footage number 202201191838 shows the following: "At around 12:30 am two officers make rounds spraying disinfectant while wearing gloves." (ECF No. 19, p. 2).  Plaintiff does not dispute this footage.

On January 20, 2022, Body Camera Footage number 202201200046 shows the following:

> At around 12:47 am an Officer makes rounds and stops at cell six.  The Plaintiff says

---

[4] Defendant summarized each of these videos in her Brief and after reviewing the footage, the Court finds the Defendant's summaries are accurate summaries of the footage.  Accordingly, the Court includes herein with notations of Plaintiff's objections, if any, to each.

Something [inaudible], the Officer then responds telling Plaintiff that they had put in a message to the doctor but are waiting for a response.

(ECF No. 19, pp. 2-3). Plaintiff's only objection to this footage is to point out Defendant did not state how this message was submitted to the jail doctor. (ECF No. 24, p. 1).

On January 20, 2022, Body Camera Footage number 202201200235 shows the following:

At around 2:37 am, Plaintiff was taken out of cell 6 and walked into an office by an officer wearing gloves. The officer sits the Plaintiff down and takes his blood pressure as well as temperature. Plaintiff's blood pressure was 131/82, pulse was 108, and temperature was 92.6 degrees. The Plaintiff is then escorted back to cell six and the Officer states that he will call the doctor.

(ECF No. 19, p. 3). Plaintiff does not object to this footage. Plaintiff testified in his deposition that several officers told him they were trying to get in touch with the jail doctor. (ECF No. 19-7, pp. 55-57). He also testified he started to feel better during the day of January 20, 2022, and some of his symptoms were starting to subside. *Id.* at 57-58.

On January 26, 2022, Plaintiff submitted a medical request for flu symptoms. (ECF No. 19-4, p. 16). He was seen by Dr. Elkins[5] the same day and prescribed an antibiotic, a steroid, and a nasal spray.[6] (ECF No. 19, p. 3). Plaintiff testified in his deposition he completed this medical request simultaneous to seeing the doctor. He also questioned Dr. Elkins during this visit regarding his vital signs from January 20, 2022. According to Plaintiff, Dr. Elkins did not know anything about Plaintiff's vitals from January 20, 2022. (ECF No. 19-7, p. 52). Plaintiff objects to

---

[5] The record reflects the LRCJ medical provider is Darryl Elkins, APRN. (ECF No. 19-1, 2). Plaintiff, however, refers to Mr. Elkins as "Dr. Elkins" and the "jail doctor." The Court will also refer to Mr. Elkins as "Dr. Elkins" for continuity in the Report and Recommendation.

[6] The Court notes the evidence on the record is somewhat unclear regarding this fact, however, Defendant Butler's Statement of Indisputable Facts states this fact and Plaintiff did not dispute it in his response. (ECF Nos. 19, 22). Additionally, Plaintiff testifies in his deposition that he did see Dr. Elkins and receive prescriptions for his symptoms on January 26, 2022. (ECF No. 19-7). As Plaintiff does not dispute it, the Court accepts Defendant's statement of fact on this issue.

Defendant's interpretation of this testimony and clarifies that he specifically asked Dr. Elkins why he did not respond on January 19, 2022 or January 20, 2022 when the LRCJ officers called him regarding Plaintiff's medical issues.  Plaintiff asserts, Dr. Elkin was unaware Plaintiff suffered any medical issues on January 19-20, 2022.  (ECF No. 24, p. 2).  Plaintiff notes in his Response, Dr. Elkins should have known about Plaintiff's medical issues if the LRCJ staff called him on January 19-20, 2022.  *Id*.

Defendant Butler was off duty and not present at the LRCJ on January 19 and 20, 2022. *Id.* at 2.  Defendant Butler was also not present on January 26, 2022, when Plaintiff saw Dr. Elkins. *Id.*

Defendant Butler states in her Affidavit, there was no confirmed or presumed COVID-19 in the LRCJ on January 19, 2022.  *Id*. at 2.  Plaintiff disputes this fact, and states the entire facility was locked down on January 19, 2022, and then released from lockdown thirty minutes later by the Sheriff.  (ECF No. 24, p. 2).

Plaintiff testified in his deposition that the LRCJ had a medical request procedure consisting of written medical request forms.  (ECF No. 19-7, pp. 30-31).  Once a form was submitted, Plaintiff could see Dr. Elkins within a week or two.  *Id.*  Plaintiff also testified Defendant told him he could get a COVID-19 vaccination once he got to the ADC, or he could request one from Dr. Elkin.  However, when Plaintiff requested a vaccination from Dr. Elkin, Dr. Elkin refused without Defendant's approval.  *Id.* at 36.

Defendant Butler also states in her affidavit the LRCJ contracts with Dr. Elkins for medical services.  Dr. Elkins is available via phone at all times and comes to the facility once a week.  (ECF No. 19-1, p. 2).  Plaintiff disputes this and states Dr. Elkins is not always available and comes once a week or every other week.  (ECF Nos. 24; 19-7).  Defendant Butler also states over-the-counter

medicine is available from jail staff.  Additionally, all staff are trained in first aid, but are not authorized to evaluate, diagnose, or treat medical conditions.  (ECF No. 19-1, p. 2).  Plaintiff disputes this fact by stating all over-the-counter medication had to be purchased from the commissary.  (ECF No. 24, p. 3).  Defendant Butler states jail staff, including herself, are not authorized to order testing or vaccination for COVID-19.  (ECF No. 19-1, p. 2).  Plaintiff disputes this fact, stating, Dr. Elkins refused him the COVID-19 vaccination without Defendant's approval. (ECF No. 24).

As Plaintiff also challenges the LRCJ policies on COVID-19 and medical care, Defendant submitted multiple LRCJ policy and procedures as well as multiple emails to LRCJ staff enumerating the evolving procedures related to COVID-19 precautions in the LRCJ.  (ECF No. 19-6).

An undated policy title "Screening of prisoners" from the Sheriff of Little River County, Bobby Walraven to all law enforcement department, officers, deputies, and state troopers, states in pertinent part:

> We are currently in the process of setting up a screening area in the sally port (first point of entry) to screen all detainees prior to them entering the facility.  If a person has a fever of 100.0 or greater, they will NOT be allowed in the Detention Center.  An arresting officer will not be allowed to drop off a person who has been arrested and leave.  If we cannot accept the detainee, the arresting officer will need to transport the person to a medical facility for treatment.
> As part of the protocol, arresting officers will be asked a set of questions about the detainee ahead of time, so they can prove that information to the detention staff.  This will help expedite the process.  We know this will be difficult for everyone because of so many unknown circumstances.
> Questions:
> 1.  Did you notice if the detainee has a cough?
> 2.  Did you notice if the detainee has shortness of breath?
> 3.  Did you notice if the detainee has any other respiratory issues?
> 4.  Do you know if the detainee has been outside the country recently, or been in contract with anyone who has?
> Also, any officer entering the facility (unless previously screened at the beginning of their

shift by their agency) will be required to have a temperature screening as well.
We ask that you make your personnel aware of these new protocols, and we also ask for everyone's patience during these difficult times.  We will strive to be as efficient as possible, so arresting officers can return to their patrol duties as soon as possible.

(ECF No. 19-6, p. 8).  Defendant Butler states this Policy of screening is implemented at all times of high to moderate risk of COVID-19 infection based on the CDC recommendation and levels of infection in Little River County.  (ECF No. 19, p. 9).

Two notices stating:

EVERYONE MUST HAVE THEIR TEMPERATURE CHECK[ED] AND WEAR A MASK BEFORE ENTERING THE JAIL!


Until told otherwise by Me or the Sheriff, we are going back full throttle on this fight against COVID!!  We will again wear masks, check temps on all and make anyone coming into the Jail wear masks, disinfect regularly, disinfect control between shifts, get **pre-approval** before **ANY** inmate comes **past Sally 1.**  They can stay on the bench until approval is met.  I've been informed by a local nurse of at least 2 families in Ashdown that have contracted the delta strain of COVID.  And by families, I mean the whole family.  I can't take the chance of our Jail contracting the virus.  We can't afford it.  Please Stay Safe and I'm Sorry guys!

(ECF No. 19-6, pp. 9-10) (emphasis in original).  As there is no explanation of these notices in Defendant's Briefing the Court is unsure if they were notices posted at the LRCJ or how they were used by Defendant.

The LRCJ Quarantine Policy and Procedure states:

Isolation
- If an inmate is showing symptoms, isolate in Holding 1 or Holding 2, separate as much as possible.
- Follow CDC recommendations and contact Jail Doctor first and advise of symptoms then follow as he recommends, if symptoms become critical contact EMS and advise EMS of COVID-19 specific symptoms
- When coming in contact with possible COVID-19 the jail staff should wear full PPE (face mask, N95 mask, eye protection, gloves, gown, and foot booties)
- Inmate should wear N95 mask when out of isolation area and anytime other people enter area.

- If inmate is under isolation, per CDC, wait up to 24 hours once they are released from isolation then clean everything in that area while wearing full PPE.
- Only confirmed cases should be housed together and only if necessary.
- Feed on disposable plates and laundry can be washed as normal per CDC
- As recommended by the CDC, staff that goes into the Isolation areas should limit themselves from the rest of the facility and minimize what staff comes in contact with the isolation cells.
- If Isolated, but not confirmed, monitor inmate twice a day.  If the isolated inmate tests negative for COVID-19 resume everything as normal.
- Monitor all staff that comes in contact twice a day, even when not at work

Quarantine

- If a person has symptoms and is moved to Isolation then quarantine the entire housing unit for 14 days, monitoring each inmates' symptoms twice a day.  If the isolated inmate tests negative for COVID-19 resume everything as normal.
- Keep movement from cells to a minimum
- Keep separated as much as possible and if someone starts showing symptoms then isolate them.
- Feed on disposable plates and laundry can be washed as normal per CDC
- Staff should wear full PPE when coming into quarantined pod, and be monitored twice a day
- If another inmate that is under quarantine begins showing symptoms, isolate that inmate and restart the 14-day period.
-

(ECF No. 19-6, p. 11).

Plaintiff also testified in his deposition about his understanding of the LRCJ's screening, isolation, and quarantining procedures.  Plaintiff stated new inmates were quarantined for seven to fourteen days when they arrived in the facility.  (ECF No. 19-7, pp. 68-69).  However, LRCJ officers would interact with quarantined inmates and then nonquarantined inmates without masks or decontaminating themselves.  *Id*.  When questioned further, Plaintiff admitted he could not see into the quarantined area.  *Id.* at 70-71.  In his Response he clarified that sometimes he could see into the area where officers would wash their hands.  (ECF No. 24).

In his Response, Plaintiff also points to portions of the LRCJ Quarantine Policy and Procedure which he claims were not followed by LRCJ staff.  Specifically: (1) officers did not wear full PPE when dealing with infected inmates; (2) inmates were not quarantined for the full

10

14 days; (3) disinfectant was never sprayed every 2 hours; and (4) this LRCJ policies conflicts with other LRCJ policies.  (ECF No. 24, pp. 3-4).

The LRCJ's Policy on emergency care for inmates reads:

MEDICAL EMERGENCY DIRECTIONS

1.  CALL DR. ELKINS.  IF NOT LIFE THREATENING, GIVE HIM 15 MINUTES.  IF LIFE THREATENING CALL EMS IMMEDICATELY.
2.  FOLLOW DR. ELKINS INSTRUCTIONS. CALL EMS OR TAKE TO HOSPITAL.
3.  CALL TRANSPORT OFFICER (GARNER OR PUMPHREY, WHICHEVER IS SCHEDULED)
4.  CALL GINA BUTLER.
5.  CALL TRACEY SMITH.
6.  FOLLOW ALL MEDICAL INSTRUCTIONS GIVEN BY DR. ELKINS AND/OR HOSPITAL.
7.  MAKE SURE ALL INSTRUCTIONS ARE PASSED ON (IN WRITING, IN SHIFT PASS ON AND VERBALLY) TO ALL JAILERS, CPT. SMITH AND GINA BUTLER.

(ECF No. 19-6, p. 12).  Plaintiff also testified to LRCJ's procedures regarding emergency medical care in his deposition.  Specifically, he testified no inmate would be transferred to the hospital unless it looked like an emergency to a lay person.  (ECF No. 19-7, p. 54).  Plaintiff explained, if it did not look like an emergency, "like bleeding out or a heart attack," then outside treatment required approval from Dr. Elkin.  *Id.*  Plaintiff also disputes this policy in his Response by arguing it was not followed: (1) Plaintiff was never transported or treated by any medical staff; and (2) Defendant Butler was not notified of his request to go to hospital.  (ECF No. 24, pp. 3-4).

Also on the record are documents that appear to be interoffice emails from Little River County Sheriff's Office showing the evolving customs, policies, and procedures surrounding COVID-19.  On March 13, 2020, the message reads in pertinent part:

Holding 1 and 2 are to only be used for Quarantine Only until further notice!  New inmates will stay in one of these two cells for a few days to make sure they do not have or show any symptoms of the Coronavirus.
Every 2 hours spray the Phenomenal Disinfectant on all touchable surfaces (Kiosk, door

knobs, benches, counters, toilet, etc.) in the Sheriff's Office.
Night Shift spray the same above surfaces in the Sheriff's Office when the doors are locked
at night and anytime someone is brought in through the Sheriff's make sure you spray again
after they have left.
At the Beginning of the Shift the Jailers coming on need to disinfect the control room and
the door handles in the Jail before the previous shift leaves.
No one else in or out . . .

(ECF No. 19-16, p. 7) (errors in original).

On March 16, 2020, the second message reads:

Two face shields have been placed in the control room to be used in the case we get any
inmate that likes to spit.
There are also face spit masks in the control room for the same issue.  If he wants to spit,
they wear the mask or stay in their cell.
Paper face masks are also in control to be given to any inmate that has a cough.  Per LR1
…

(ECF No. 19-6, p. 6) (errors in original).

On March 16, 2020, the third message reads in pertinent part:

Above the computer posted on the window is a letter from LR1 regarding screening
procedures for prisoners.  Make sure you read this letter.  Continue cleaning and
disinfecting regularly.  In the control room to the left of the computer you'll find face mask
for any inmates who are coughing ect.

(ECF No. 19-6, p. 5) (errors in original).

On March 17, 2020, the message reads in pertinent part:

1.  All inmates and arresting officers coming into jail must have temp check before coming
    thru Sally 1.  No Exceptions!!! Including Doctor Elkins.
2.  No Church Calls, Attorney visits by phone only.
3.  Sally 1 is to remain locked, not propped AT ALL Times per LR 1.

(ECF No. 19-6, p. 4) (errors in original).

On March 19, 2020, the message reads:

PER LR 1
No one is allowed into Dispatch unless its an emergency and they need your help, but make
sure you clean your hands before entering.  If you have to relieve them so that they can use
the bathroom remove your gloves and wash your hands before going into Dispatch.  Also,

make sure you have each inmate wash their hands before you hand them their food tray.
There is a new way we are doing laundry, Please make sure you show each person that
comes onto shift to relieve you on how to do it or make sure you ask someone to show you
ho w to do it if you do not know.
No one in or out.
. .
(ECF No. 19-6, p. 3) (errors in original).

On March 23, 2020 the message reads:

Apparently there has been some sort of miscommunication on what we are supposed to be
doing as far as checking people before they enter the jail.
EVERYONE is to have their temperature checked IN THE SALLY PORT before entering
the jail (Sally 1).  I don't care if it's the Sheriff himself . . . . Everyone is to have their
temperature checked in the sally port.  If you let them come through that first door, you are
now exposing the control room to whatever they may have.
This is supposed to be your safe haven that you know is sanitary and clean and not exposed
to any germs.  If you let someone in without checking them, you've destroyed that safe
haven.
I know this is a headache, but it's what is best for everyone for the time being.  If you just
go home and come to work, everyone should be safe and not have to worry about this virus.
Keep up the good work guys.  We really appreciate the effort and hard work y'all are doing.

(ECF No. 19-6, p. 2) (errors in original).

On April 9, 2020, the message reads:

Apparently there has been some confusion when information was passed on by mouth
concerning face masks in the jail, so I will clarify it for everyone.
Anyone that passes the very 1st door (Sally 1) MUST have their temperature checked and
MUST have a mask on.  This includes jailers, officers, new inmates, doctors, etc.
We are doing everything we possible can to make sure our jailers and the inmates are safe
and they are not being exposed to any viruses.  This also keeps the jailers' families safe as
well.
If you have had your temperature checked on one shift, and then you come in on another
shift, they will check your temperature again so that they know their area is safe.  If you do
not feel you need your temperature checked a second time, don't come into the jail.  Our
jailers are doing exactly what they were told to do!
If any of you have any problems with the Sheriff's rules, by all means take it up with him.
Ya'll stay safe out there and thank you all for doing a good job and keeping everyone
(including yourselves) safe.

(ECF No. 19-6, p. 1) (errors in original).

In her Affidavit, Defendant Butler also stated: (1) inmates must be tested for COVID-19

prior to transport to the ADC; (2) for the last eighteen months rapid COVID-19 tests have been available through the Arkansas Department of Health at no cost to the LRCJ; (3) all medical testing including COVID-19 testing, is ordered by Dr. Elkins (except for the ADC required COVID-19 test to transport); (4) COVID-19 testing of detainees or staff with no symptoms has not been authorized by the LRCJ; (5) all medication, treatment, and vaccinations must come through an order from Dr. Elkin or other medical professional.  (ECF No. 19-1).

Plaintiff was transferred out of LRCJ on January 28, 2022.  (ECF No. 19-1. P. 1).

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607.  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities.  The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted).  "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.*  Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.*  To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under Section 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  To sustain an official capacity claim against such an entity a plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452

F.3d 967, 973 (8th Cir. 2006).  Thus, Plaintiff's official capacity claims against Defendant are "functionally equivalent" to alleging her employer, Little River County, had "a policy, custom, or [took an] official action" that deprived him of his constitutional rights.  *Veatch*, 627 F.3d at 1275; *Johnson*, 452 F.3d at 973.

> To establish a claim for "custom" liability, Plaintiff must demonstrate:
>
> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the official of that misconduct; and
>
> 3) That Plaintiff was injured by acts pursuant to the government entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, p. (8th Cir. 2013).  "A single deviation from a written, official policy does not prove a conflicting custom."  *Id.* (quoting *Jane Doe A v. Special Sch. Dist. of St. Louis*, 901 F.2d 642, 646 (8th Cir. 1990)).

## IV.  DISCUSSION

Plaintiff makes two official capacity claims against Defendant Butler in his Complaint. Claim 1 is that Defendant Butler denied Plaintiff medical care by refusing to test him for and vaccinate him against COVID-19, however, Plaintiff clarifies in his deposition that his Claim 1 is one alleging the COVID-19 policy and procedures in place at the LRCJ were inadequate to prevent the infection and transmission of COVID-19.  (ECF No. 19-7, p. 83).  Defendant interprets Plaintiff's Claim 1 as a failure to protect from COVID-19 in her Motion for Summary Judgment. Plaintiff does not dispute this interpretation.  Accordingly, the Court will address Claim 1 as such as well.  In Claim 2 Plaintiff alleges he was denied medical care through Defendant's refusal to

transport him to the emergency room on January 19, 2022 and January 20, 2022.  The Court will address each claim in turn below.

While the Court recognizes Plaintiff only asserted official capacity claims against Defendant Butler in both Claim 1 and Claim 2, Defendant provided the Court with analysis on both individual and official capacity claims.  Accordingly, the Court will address all arguments made and address both individual and official capacity claims in both Plaintiff's Claim 1 and Claim 2.

### 1. Claim 1 – Failure to protect from COVID-19

The material facts to Plaintiff's Claim ,1 as enumerated above, are largely undisputed, save for (1) whether Plaintiff contracted COVID-19 and (2) whether Defendant Butler had the authority to order a COVID-19 test and vaccination for Plaintiff.  Defendant argues Plaintiff cannot produce a positive test indicating he contract COVID-19 while incarcerated in the LRCJ, and therefore, he cannot successfully allege a claim for failure to protect from a disease he did not in fact contract.  Plaintiff argues in response: Defendant refused to test him for COVID-19, but had they tested him, he would have tested positive as he suffered all the typical symptoms of COVID-19 as did all the other LRCJ inmates at that time.  For this Report and Recommendation, the Court will assume *arguendo* Plaintiff did in fact contract and suffer from COVID-19 while housed in the LRCJ.  Plaintiff also asserts Defendant Butler had the authority to test and vaccinate him for COVID -19.  Accordingly, the Court will also assume *arguendo* that Defendant Butler held the authority to test and vaccinate Plaintiff for COVID-19.[7]

---

[7] The Court makes these assumptions in an effort to view all facts and reasonable inferences in a light most favorable to Plaintiff, the nonmoving party.  *See* Fed. R. Civ. P. 56(a); *Matsushita*, 475 U.S. at 587.

In *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993), the Supreme Court held the Eighth Amendment protects against future harm to inmates if the plaintiff proves threats to personal safety from conditions, such as mingling of inmates with serious contagious diseases with other inmates, and if the conditions reveal deliberate indifference to a substantial risk of serious harm.  An Eighth Amendment claim for failure to protect is stated if a prison official is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm. *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998).  There are two elements to a failure to protect claim: (1) whether the situation presented a substantial risk of serious harm; and (2) whether the prison official was deliberately indifferent to the inmate's health or safety. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The prison official's state of mind is measured by a subjective, rather than an objective standard. *Farmer*, 511 U.S. at 838-839.  "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal recklessness." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 206) (citations and quotations omitted).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Farmer*, 511 U.S. at 837.

As this Court has previously noted, it is "keenly aware of the significant health risks associated with COVID-19 and the ease with which this disease is transmitted, especially in a prison setting." *Choate v. Runion*, Civil No. 4:20-cv-04109, 2022 WL 3908836, *6 (W.D. Ark. Aug. 30, 2022) (quoting *Tate v. Arkansas Dept. of Corr.,* No. 4:20-cv-0558, 2020 WL 7378805, *8 (E.D. Ark. Nov. 9, 2020)).  Accordingly, the Court assumes for purposes of this Report and Recommendation that COVID-19 posed an objectively serious medical risk to Plaintiff.  **The**

question then becomes whether Plaintiff has alleged facts (rather than conclusions) from which the Court can plausibly infer the subjective prong is met.

"[T]he prison is a finite space. It would be impossible to isolate every inmate who is potentially infected—the prison does not have enough space to house each such inmate in a single cell." *Choate,* 2022 WL 3908836 at *6 (citation omitted). The Court's role is not to assess whether Defendant could have done more to protect against the virus, but instead it is limited to determining whether Defendant has shown her efforts to combat COVID-19 satisfied the constitutionally required minimum. *Id.* at *7 (citing *Valentine v. Collier,* 978 F.3d 154, 158 (5th Cir. 2020)).

Here, the summary judgment record shows LRCJ and Defendant Butler had policy and procedures in place to prevent the infection and spread of COVID -19 in the LRCJ. Specifically, (1) temperature checks to enter the building; (2) PPE requirements for staff; and (3) quarantining of new inmates and sick inmates. While Plaintiff does claim some jail officers failed to follow the LRCJ policy and procedures related to COVID, he does not allege facts which establish a reckless disregard for the risk of COVID-19. Instead, the record includes established policy and procedures aimed at preventing the infection and spread of COVID-19, internal emails showing prior attempts at enforcing the COVID-19 policy and procedures, and Defendant's Affidavit stating:

> It has been and remains the policy of [LRCJ] to monitor levels of infection of COVID throughout Little River County as well as monitor current CDC recommendations regarding mask use, isolation, quarantine, and other pandemic protocols . . .
> Because of the changing nature of the COVID-19 virus and the recommendations, guidelines, testing, symptoms, quarantine, and treatments for COVID-19, it has been the constant policy of the [LRCJ] to focus on the situation as it existed in the [LRCJ] and to respond to all medical issues for diagnosis, treatment, or protection of the individuals detained in and working in the [LRCJ] by reference to the jail medical provider.

(ECF No. 19-1).

While the implementation of LRCJ's COVID-19 policy and procedures may not have been perfect, it does not rise to the level of a constitutional violation. *See Morris v. King*, 2022 WL 9833541, *16 (W.D. Ark. July 29, 2022) (citing *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (explaining the incidents of infections in prisons do not alone violate the Eighth Amendment, as prisons are densely populated residences subject to outbreaks); *Harmon v. Harris*, 2023 WL 1767578 (E.D. Ark. Jan. 10, 2023) (explaining the Arkansas Department of Correction officers that housed the plaintiff in a commingled unit with COVID positive inmates and unvaccinated inmates were entitled to qualified immunity because there was no clearly established constitutional right to be housed with only COVID-free and COVID-vaccinated inmates).

Plaintiff's specific claim that Defendant Butler's refusal to test and vaccinate him considered along with the totality of the circumstances at the LRCJ also fails to rise to the level of deliberate indifference. Plaintiff was a healthy twenty-nine years old with no underlying health conditions at the time in issue. Plaintiff was also slated to transfer to the Arkansas Department of Corrections and would receive his vaccination upon that transfer. Finally, Defendant Butler had in place preventative policy and procedures to combat the spread of COVID-19 in the LRCJ. *See Raper v. Maxwell*, 2022 WL 2784488, *4 (W.D. Ark. May 6, 2022) (failure to provide COVID-19 vaccination did not raise to the level of deliberate indifference and was negligent at most). Accordingly, the record does not contain facts that show Defendant Butler's mental state was akin to criminal recklessness, thus, establishing deliberate indifference.

Plaintiff also argues the COVID-19 policies and procedures were not always followed by the jail officers. An employees' failure to follow policies and procedures does not state a cognizable claim under Section 1983. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("there is no federal constitutional liberty interest in having . . . prison officials follow prison

regulations"); *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir. 1997) ("there is no § 1983 liability for violating prison policy").  Furthermore, in cases brought under Section 1983, supervisors are not liable for constitutional violations committed by their subordinates simply because they are their supervisors.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (there is no *respondeat superior* theory available under Section 1983).  However, a prison supervisor can be held liable for failing to train or supervise subordinates or for tacitly authorizing misconduct by failing to take corrective action after learning of a violation.  *See* Boyd *v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).  To state a claim for failure to train or supervise, there must be allegations: 1) the supervisor knew of a pattern of unconstitutional acts committed by the subordinate; 2) the supervisor demonstrated deliberate indifference to, or unspoken authorization of, constitutional violations committed by subordinates; 3) the supervisor failed to take appropriate remedial action after learning of a subordinate's misconduct; and 4) the plaintiff was injured as a result of the failure to properly train or supervise subordinates.  *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  As with failure to protect, the standard for proving deliberate indifference is high in failure to train claims.  Even where prison officials know of a substantial risk to inmate health or safety, they are not liable, "if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Plaintiff, however, does not allege a failure to train claim here against Defendant Butler, and moreover, Plaintiff has no lasting injury from his presumed (for purpose of this Report and Recommendation) COVID-19.

Accordingly, considering the facts in the light most favorable to Plaintiff and even assuming *arguendo* he suffered COVID-19, he has failed to show deliberate indifference by Defendant Butler through her actions or inactions (individual capacity) or through the policy and

procedures she enacted for the LRCJ (official capacity) for failure to protect him from COVID-19.

### 2. Claim 2 – Denial of medical care

At the time in issue here, Plaintiff was a convicted inmate. The Eighth Amendment prohibition on cruel and unusual punishment prohibits deliberated indifference to the serious medical needs of prisoners. *Luckert v. Dodge County,* 684 F.3d 808, 817 (8th Cir. 2012). To succeed on this type of claim, Plaintiff must demonstrate (1) that he had an objectively serious medical need, and (2) that the Defendants actually knew of, but deliberately disregarded, that serious medical need. *See Ivey v. Audrain Cnty., Mo.*, 968 F.3d 845, 848 (8th Cir. 2020). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (internal citation and quotation omitted). "[T]o demonstrate that a defendant actually knew of, but deliberately disregarded, a serious need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [inmate's] health." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018). The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, . . . but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (internal citations and quotations omitted).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of*

*Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011). Unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub v. VonWald,* 638 F.3d 905, 919 (8th Cir. 2011) (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding a three-week delay, "coupled with knowledge of inmate-patient's suffering, can support a finding of an Eighth Amendment violation").

Here, the facts alleged by Plaintiff state a delay of medial care claim rather than a denial of medical care claim as he was seen by Dr. Elkins for his complained of symptoms on January 26, 2023. When a delay in medical treatment is the alleged constitutional deprivation, the objective seriousness of the deprivation must also be measured by reference to the effect of delay in treatment. As a result, to succeed on a delay in medical treatment claim, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (internal citations and quotations omitted). In the absence of evidence establishing a detrimental effect of the delay, a plaintiff fails to raise a genuine issue of fact on an essential element of the claim. *Id.*

Plaintiff requested treatment, specifically transport to the emergency room, in the early morning hours of January 20, 2023 for body aches, a headache, and other flu-like symptoms. The Court will continue to assume *arguendo* that Plaintiff suffered from undiagnosed COVID-19 on

January 19-20, 2022, and that COVID-19 is an objectively serious medical condition.[8]  Plaintiff was not provided with the specific care he requested—transport to the emergency room—but he was seen by a medical professional for his complaints six days later.  At that time, Plaintiff was prescribed medication for all lingering symptoms he suffered.  Plaintiff is entitled to adequate medical care, but not the specific medical care of his choice.  *Meuir v. Greene County Jail Employees,* 487 F.3d 1115, 1118-19 (8th Cir. 2007).

It is undisputed the delay in Plaintiff's medical care did not cause any negative prognosis and Plaintiff's symptoms were not escalating to the point that a lay person would determine medical attention was obvious.  The body camera footage on the record showed Plaintiff's interaction with the non-party officer in the early morning of January 20, 2023.  (ECF No. 19-5).  During this interaction, Plaintiff is observed conscious, ambulating on his own, breathing normally, and speaking intelligently to the officer.  *Id.*  Plaintiff does appear uncomfortable, however, there was nothing in this body camera footage to alert a lay person to an acute or escalating situation warranting a trip to the emergency room.  Additionally, Plaintiff testified in his deposition that during the day of January 20, 2023, mere hours from his request to visit the emergency room, he was already beginning to feel better.  (ECF No. 19-7, pp. 57-58).  When Plaintiff was seen by the jail doctor on January 26, 2023, he was provided with three prescriptions to treat his lingering flu-like symptoms.  Finally, Plaintiff testified in his deposition he has no long-

---

[8] Plaintiff also provides an extensive argument related to his low temperature on the night of January 19, 2022 or early morning of January 20, 2022.  Specifically he argues, because of this low temperature, non-party, Officer McFadden, should have recognized a need for emergency care.  However, just as with the Court's analysis based on Plaintiff's COVID-19 symptoms, there is no evidence in the record to show any negative prognosis or results from the delay of treatment of Plaintiff's low body temperature.  Thus, Plaintiff has also failed to state a cognizable delay of medical care claim related to his low body temperature claims.

term symptoms other than a lingering muted sense of smell.  (ECF No. 19-7, pp. 58-59).  The Court does not find this muted sense of smell constitutes a negative prognosis.

Accordingly, based on the summary judgment record, taken in the light most favorable to Plaintiff, no constitutional violation for denial or delay of medical care is stated against Defendant in her individual or official capacity.[9]

### V. CONCLUSION

For the reasons stated above, I recommend Defendant Gina Butler's Motion for Summary Judgment (ECF No. 17) be **GRANTED** and the individual and official capacity claims against her be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 5th day of July 2023.**

/s/  *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

---

[9] The Court need not analyze the policy and procedures of LRCJ regarding medical care as the facts alleged do not rise to the level of a constitutional violation.  If there was no constitutional violation, then the policy and procedures could not have caused any such violation.